## WALLS v. BRUNDIDGE.

# Opinion delivered July 11, 1913.

1. ELECTIONS—RIGHT TO VOTE—POLITICAL RIGHT.—The right of a citizen to vote and to be voted for at an election, or to be a candidate for or to be elected to an office, is a political right and not a civil or property right. (Page 257.)

2. ELECTIONS—CONTESTS—JURISDICTION OF CHANCERY COURTS.—The trial of election contests and the adjudication of political rights, and the protection of persons in their enjoyment, were not matters of cognizance by courts of equity at the time of the adoption of the Constitution of 1874, and courts of equity were given no jurisdiction of election contests by the Constitution. (Page 258.)

3. ELECTION CONTESTS—RIGHTS OF CONTESTANT.—The provision in Act 371 of the Acts of 1911, providing that "Nothing in this act shall be so construed as to prevent a person from pursuing any remedy he may have in any of the courts of this State," in a contested election case, does not confer any right upon the contestant that he did not already have, under the law before the passage of the act. (Page 262.)

4. ELECTIONS—JURISDICTION OF CHANCERY COURT—CONTESTS—RIGHTS OF CONTESTANT.—Under the Constitution the chancery court is without power to hear election contests, and such right is not given by Act 371, Acts of 1911, which expressly provides tribunals of the political party for the determination of contests in primary elections, and provides that their determination shall be final. (Page 263.)

5. ELECTIONS—PRIMARY ELECTIONS—CONTESTS—POLITICAL ORGANIZATIONS—JURISDICTION OF CHANCERY COURT.—Since a political organization is an unincorporated, voluntary association, involving no rights of property or personal liberty, a court of equity has no jurisdiction to interfere by injunction to control its actions, or those of its officers. (Page 263.)

6. EQUITY JURISDICTION—PRIMARY ELECTION CONTEST—INJUNCTION.—An injunction will not lie to determine questions of appointment to public office and the title thereto, since they are purely legal matters and cognizable only in courts of law (Page 263.)

7. EQUITY JURISDICTION—PRIMARY ELECTION CONTEST—ACTS OF ELECTION OFFICERS.—A court of equity will not interfere by injunction to prevent election officers or canvassing officers from doing their duty as required by law, nor prevent them from canvassing votes in a certain way. (Page 264.)

8. POLITICAL PARTIES—PRIMARY ELECTION CONTESTS—ACTS OF POLITICAL TRIBUNALS—FINALITY—REVIEW.—The Democratic party, as well as the Legislature of the State, having provided a tribunal for hear-

ing the contests of the primary elections of the party, the decision of such tribunal is final and can not be reviewed by the courts.  (Page 264.)

9.  PRIMARY ELECTION CONTESTS—ACTION OF POLITICAL TRIBUNAL—FINALITY—JURISDICTION OF EQUITY TO REVIEW.—In a contest over the result of a primary election, where the tribunal of the political party, under its rules, and under the statute, determined the contest and declared the result, a court of equity, upon application of a contestant, is without jurisdiction to issue an injunction to compel the policital tribunal to hear the contest in the first instance, and such court of equity is without jurisdiction to review the findings of the party tribunal and declare the result of the election in accordance with the court's view of the rights of the parties.  (Page 266.)

Appeal from Pulaski Chancery Court; *John E. Martineau*, Chancellor; reversed.

### STATEMENT BY THE COURT.

There being a vacancy in the office of Governor of the State of Arkansas, and a special election having been called to fill same by Acting Governor J. M. Futrell, as required by the Constitution, fixing the date thereof as July 23, 1913, the Democratic party, through its central committee, called a primary election for making the nomination of a candidate for the office, fixing the date of such election June 21, 1913.  It also fixed June 30 thereafter as the date upon which the central committee should meet for canvassing the returns of the election and certification of the nominee.  The appellee gave notice that he would contest the election before the central committee at its meeting to canvass the returns and the nomination of his opponent, Judge Hays, under the provisions of Act 371 of the Acts of 1911.

Fearing that the committee might not hear the contest, he also procured a mandatory injunction from the Pulaski Chancery Court, directing the said committee to proceed and hear his contest upon its meeting to ascertain and announce the result of the primary election and certify the nominee, which injunction was read to the committee upon its meeting upon the said 30th day of June.

At the meeting of the committee after three days' hearing of the contest, it determined from the evidence before it and from such investigation as it had had opportunity to make, within the time limited for the hearing thereof and thereafter certifying the nominee to the Secretary of State within the time prescribed by law, that there was no proof to sustain the allegations of fraud made by the contestant and that the returns showed that Judge Hays had received 861 votes more than his opponent, the appellee, and declared him the nominee of the party and certified his nomination to the Secretary of State on July 2, 1913.

Thereupon, appellee filed a supplemental complaint in the chancery court, alleging that the committee had violated the preliminary injunction, had not granted him a hearing of the contest, had not heard the same as required by law, "but had only conducted a feigned and pretended hearing, had made no investigation of the fraud alleged to have been perpetrated in the contest filed, had refused to allow appellee a reasonable time in which to produce his evidence and arbitrarily and oppressively violated appellee's rights and fraudulently certified the name of George W. Hays, contestee, before said committee to Earle Hodges, the Secretary of State, as the Democratic nominee." That said Secretary of State, unless restrained from so doing, will certify the name of said contestee, George W. Hays, to the various county election commissioners as the Democratic nominee for Governor, and "that if same be done, contestee will be deprived of all rights under the law as contestant of said election, and that said certification if allowed to proceed will operate and amount to an absolute denial to him of the right to proceed with his contest as allowed by law, and the decretal order of the court, and will result in rendering absolutely nugatory and of no effect whatever, said decretal order of the court, and that it is his intention to further prosecute the said contest before the proper tribunal to a final determination in the forum as provided by law. Prays that Earle Hodges, Secretary

of State, be made a party, and that a restraining order issue preventing his certifying to the county boards of election commissioners the name of George W. Hays as the nominee, and that upon a final hearing that the restraining order be made permanent."

The appellants answered, admitting that the Democratic State Central Committee is a body especially created by statute for the purpose of hearing contests and certifying nominees of the party; that it met on June 30, 1913, in accordance with its rules adopted prior thereto; that it heard and considered all the evidence presented by the contestant, allowing him all the time possible in which to present his contest, and permit the committee to ascertain and determine the result of the election and certify the name of the nominee to the Secretary of State twenty days before the date fixed for the election, July 23, 1913, as required by law. That after hearing all the evidence and argument of counsel, and acting as they believed, in compliance with the injunction and in full compliance with their duty under the law, found that the allegations of fraud were not sustained, were without foundation and dismissed his petition for want of proof. That it further found that George W. Hays had received a majority of all the votes cast in the primary election and was entitled to a certificate as nominee of the Democratic party and directed its chairman and secretary to certify his name to the Secretary of State as such Democratic nominee for the office of Governor. It also alleged that the law requires the Secretary of State to certify out the said nomination to the boards of election commissioners of the counties eighteen days before the election, and prayed that the temporary injunction be dissolved and a perpetual injunction be denied.

The chancellor granted the relief prayed for and enjoined the Secretary of State from certifying out the nomination made and returned to him by the said Democratic Central Committee, and from the decree this appeal comes.

*Gaughan & Sifford* and *Coleman & Gantt,* for appellants.

In the absence of a statute giving them jurisdiction, the courts have no power to interfere with the judgments of committees and tribunals of established political parties in matters involving party government, discipline or the nomination of candidates. 15 Cyc. 330-332; 67 N. W. (Neb.) 755, 757; 76 N. W. (Mich.) 914; 112 N. W. (Mich.) 1071.

A court of equity has no power to try contested elections or title to office, and such court has never exercised that power except in cases where it has been conferred by express enactment or by necessary implication therefrom. 15 Cyc. 397; 78 Ill. 237; 151 Ill. 41, 25 L. R. A. 143; 69 Fed. 852, 30 L. R. A. 90; 189 U. S. 475, 47 L. Ed. 909. The Constitution of the State empowers the Legislature to create chancery courts and vest them with jurisdiction in matters of equity, and the Legislature can give to such courts jurisdiction only in matters of equity. Election contests for nominations are not matters of equity, and have never been so considered. 80 Ark. 145; 15 Cyc. 331; 5 Pomeroy Eq. Jur. 324, 331-4; 123 N. Y. 609; 25 N. E. 1057. "No principle of the law of injunction is better settled than that injunction does not lie to determine questions of appointment to public office and the title thereto, as they are of a purely legal nature and cognizable only in courts of law." 5 L. R. A. (W. Va.) 334; 3 L. R. A. (W. Va.) 954; 17 O. St. 201; 6 Am. & Eng. Enc. of L. 392; 69 Ark. 606, 611; 122 S. W. (Tenn.) 979; 43 Ark. 63; 84 Ark. 540; 38 Pac. 468; 90 Pac. 1034; 99 N. W. (Neb.) 681; 70 Pac. (Mont.) 519, 523.

*C. D. James, T. J. Gaughan, W. F. Coleman* and *J. H. Carmichael,* for appellants.

1. Act 371 of the Acts of the Legislature of 1911, which attempts to provide for the manner of holding a primary election in the State of Arkansas, is unconstitutional and void. 80 Ark. 145. When the Constitution has spoken on any particular subject, and has included one thing of a kind, it excludes all others, under the prin-

ciple *"expressio unius est exclusio alterius."* *Id.* 145,
150; Broom's Legal Maxims 480, 489; 9 Cyc. 584; 19 Cyc.
23, 27; 1 Ark. 283; *Id.* 513; 20 Ark. 410; 27 Ark. 479; 43
Ark. 676; 35 Ark. 457; 49 Ark. 231; 60 Ark. 95; 51 Ark.
534; 3 Words and Phrases 2330, "Election;" Bouvier;
Anderson.

2. The chancery court was clearly without power
to hear and determine this controversy for the reason
above stated, and for the further reason that, if the act
is held to be constitutional, it has provided a tribunal
for the hearing of such controversy whose decision is
final and from which there is no appeal to the courts. If
this tribunal is a court, it is of concurrent jurisdiction
with the chancery court, and obtained jurisdiction first.

If the State Central Committee is an inferior tri-
bunal to the courts, then the circuit court, and not the
chancery court, has jurisdiction, because, in this State,
all jurisdiction not specifically vested in some other
court, is vested in the circuit court. See Kirby's Dig.,
§ 1315. This controversy falls squarely within the doc-
trine announced by the court in the bridge district cases.
96 Ark. 424; 106 Ark. 151.

*Hal L. Norwood* and *J. M. Stayton,* for appellee.

1. The act is constitutional. In none of the States
where are found the opinions relied on by appellants is
there a law such as ours. 74 Pac. (Col.) 896; 62 Atl.
(Md.) 249; 89 N. W. (Minn.) 1126; 56 Atl. (N. J.) 1; 51
N. E. (O.) 150; 66 Pac. (Ore.) 714; 92 N. W. 4.

2. Under the allegations set forth in the original
complaint, there was jurisdiction in the chancery court
to issue a mandatory injunction to compel the State Cen-
tral Committee of the party to hear the contest filed by
the appellee. 87 S. W. (Ky.) 786; *Id.* 805; 89 S. W. 1;
75 S. W. 1082; 120 S. W. 343; 84 S. W. 767; 100 N. W.
925; 121 S. W. 468; 31 S. W. 290; 97 Pac. 396; 71 S. W.
892; 86 S. W. 697.

·The holding in *Hester* v. *Bourland,* 80 Ark. 145, was
merely that the Legislature had no power to vest in a
court of chancery jurisdiction to hear election contests,

whereas, that is not the object of this suit, but the aid of the chancery court is sought only to compel the granting to appellee of a right which is conferred upon him by statute.

3. It appearing by the supplemental complaint filed that the State Central Committee did not obey the court's mandatory process, but only made a feigned and pretended investigation, arbitrarily refused to produce evidence which appellee had requested to be brought before it, and failed to hear the contest, it was within the power of the chancery court to order the State Central Committee to proceed with the contest in order to preserve the rights of the appellee, and, pending the hearing of such contest, to grant an injunction restraining the Secretary of State from certifying out the purported nomination to the county boards of election commissioners. Where chancery has rightfully assumed jurisdiction of the parties and subject-matter for certain purposes, it will grant complete relief without remitting the parties to an action at law for further relief. 75 Ark. 52; 77 Ark. 570. Where a party has put himself upon the merits without objection to the jurisdiction of equity, he can not object at the hearing, nor on appeal, unless the court is wholly incompetent to grant relief. 14 Ark. 345; 17 Ark. 340; 18 Ark. 583; 13 Ark. 193; 15 Ark. 307; 30 Ark. 89, 91. See also, on the question of jurisdiction, and power to grant the mandatory injunctions, 62 Pac. 664; 87 S. W. 787; 77 Ark. 555; 23 Am. & Eng. Enc. of L. (2 ed.) 372; 19 *Id.* (2 ed.) 737-739; 62 Atl. (Pa.) 258; 76 N. W. (Minn.) 285; 91 N. W. 950. The failure alone on the part of the committee to send for the ballots and to recount the same in the counties where the contestant alleged fraud had been perpetrated, was a failure to hear the contest. 59 So. 71; 58 So. 582; 57 So. 272.

If appellant's construction of section 6 of the act of 1911 (Act 371) is correct, the law gives no relief to a candidate who alleges fraud. The courts are under the

duty to give such construction to the law as to make it effectual. 134 N. Y. 374.

The law should and does throw around a candidate for nomination for an office the same rights as if he were a candidate in the general election, and for every wrong against such a candidate there is a remedy. 135 N. Y. S. 187.

4. An application for mandamus would have afforded no remedy whatever. Had appellee made an application for a writ of mandamus, the thing that it was necessary to prevent would have been accomplished before he could have complied with the requirements of the statute governing applications for mandamus. 84 S. W. 767.

KIRBY, J., (after stating the facts). It is insisted that the chancery court was without jurisdiction to issue an injunction against the Secretary of State to prevent him from certifying the name of the candidate as the nominee of the party, that had been furnished him for that purpose by the executive committee of the Democratic party in accordance with the requirements of law; its action in so doing being in effect a trial of the election contest and an attempted review of the State Democratic Central Committee, a tribunal provided by law for the trial of such contests and the certification of the nominee, and a substitution of the judgment of the chancellor for that of the committee.

The recognized and established distinctions between equity and common law jurisdictions are observed in this State. The Constitution vests the judicial power of the State in certain courts, giving to the circuit courts jurisdiction in all civil and criminal cases, the exclusive jurisdiction of which is not vested in some other court provided for by it, and it also provides that the General Assembly may establish separate courts of chancery, and until it shall deem it expedient to do so, the "circuit court shall have jurisdiction in matters of equity." Article 7, sections 1, 11 and 15, Constitution 1874.

It is well also to bear in mind that the right of a

citizen to vote and to be voted for at an election, or to be a candidate for or to be elected to an office is a political right in contradistinction to a civil or property right. *Gladish* v. *Lovewell*, 95 Ark. 621; *Fletcher* v. *Tuttle*, 151 Ill. 41; 37 N. E. 683; 25 L. R. A. 143; 10 Am. St. Rep. 220; In re *Sawyer*, 124 U. S. 200; *Giles* v. *Harris*, 189 U. S. 475; *Green* v. *Mills*, 69 Fed. 857; 16 C. C. A. 552; 30 L. R. A. 90; *Winnett* v. *Adams*, 99 N. W. (Neb.) 681.

The Legislature has created separate courts of chancery, but it could only vest them with jurisdiction "in matters of equity," under authority of the Constitution, and it becomes necessary to determine whether courts of equity had jurisdiction to protect a person in the enjoyment of purely political rights at the time of the adoption of the Constitution.

In *Fletcher* v .*Tuttle, supra,* the court, passing upon a question like the one presented here, and denying the right to an injunction, said:

"The question then is, whether the assertion and protection of political rights, as judicial power is apportioned in this State between courts of law and courts of chancery, are a proper matter of chancery jurisdiction. We would not be understood as holding that political rights are not a matter of judicial solicitude and protection, and that the appropriate judicial tribunal will not, in proper cases, give them prompt and efficient protection, but we think they do not come within the proper cognizance of courts of equity * * *."

"Wherever the established distinction between equitable and common law jurisdictions is observed, as it is in this State, courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political, and where no civil or property right is involved. In all such cases, the remedy, if there is one, must be sought in a court of law. The extraordinary jurisdiction of courts of chancery can not, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office. Nor can it be invoked

for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held. These matters involve in themselves no property right, but pertain solely to the political administration of government. If a public officer, charged with political administration, has disobeyed or threatens to disobey the mandates of the law, whether in respect to calling or conducting an election, or otherwise, the party injured or threatened with injury in his political rights is not without remedy. But his remedy must be sought in a court of law, and not in a court of chancery.''

In re *Sawyer*, 124 U. S. 200, the court said:

''The offices and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the express protection of rights of property. Political rights consist in the power to participate directly and indirectly in the establishment or management of the government. These political rights are fixed by the Constitution. Every citizen has the right to vote for public officers, and of being elected. These are political rights which the humblest citizen possesses. Civil rights are those which have no relation to the establishment, support or management of the government. They consist in the power of acquiring and enjoying property, and exercising the paternal and marital powers and the like.

In *Green* v. *Mills, supra,* Mr. Justice Fuller, delivering the opinion of the court, said:

''The jurisprudence of the United States has always recognized the distinction between common law and equity, as under the Constitution, matter of substance as well as of form and procedure.   *   *   *   It is well settled that a court of chancery is conversant only with matters of property and the maintenance of civil rights. The court has no jurisdiction in matters of a political nature nor to interfere with the duties of any department of government unless under special circumstances, and when necessary to the protection of the rights of prop-

erty, nor in matters merely criminal or merely immoral, which do not affect the rights of property."

The editor of the A. & E. Ann. Cas., in a note to the case of *U. S. Standard Voting Machine Co.* v. *Hobson*, 10 A. & E. Ann. Cas. 977, states the rule as follows:

"It seems to be the uncontroverted rule that a court of equity will not interfere to protect or to enforce a purely political right. If a political right is infringed upon, the redress must be sought in a court of common law. Otherwise, there would be an invasion of the domain of other departments of the government, and of the courts of common law." Citing cases in support thereof.

The Supreme Court of Nebraska, in *Winnett* v. *Adams, supra,* says:

"The doctrine that equity is conversant with matters only of property and the maintenance of civil rights, and will not interpose for the protection of rights which are merely political, is supported by an almost unbroken line of authorities."

It then cites the authorities, and, after stating it does not care to commit the court unqualifiedly to the doctrine that a court of equity will not, under any circumstances, interfere for the protection of political rights, continues:

"But we think it is perfectly safe to adopt the doctrine to the extent of holding that a court of equity will not undertake to supervise the acts and management of a political party for the protection of a purely political right. We do not overlook the fact that primary elections have become the subject of legislative regulation, and it may be conceded that each member of a political party has a right to a voice in such primary, and to seek nominations for public office at the hands of his party. But when he is denied these rights, or unreasonably hampered in their exercise, he must look to some other source than a court of equity for redress. To hold otherwise would establish what could not but prove a most mischievous precedent, and would be a long step in the di-

rection of making a court of equity a committee on credentials, and the final arbiter between contesting delegations in political conventions. The voters themselves are competent to deal in such matters without the guiding hand of the chancellor, and it will make for their independence, self-reliance and ability for self-government to permit them to do so. It is true they may make mistakes, but courts themselves have been known to err." See also case note to *Shoemaker* v. *City of Des Moines,* 3 L. R. A. (N. S.) 382.

From these authorities it is conclusive that the trial of election contests and the adjudication of political rights and the protection of persons in their enjoyment were not matters of cognizance by courts of equity when our Constitution was adopted, and the Legislature had power only to vest the chancery court with jurisdiction in matters of equity, and was without power to enlarge such jurisdiction beyond such matters as courts of equity at the common law exercised jurisdiction in, and such courts having no jurisdiction of election contests and the adjudication of political rights were given none by our said Constitution. Our court has recognized this fact, and in declaring an act of the Legislature attempting to give chancellors and chancery courts the right to hear primary election contests void and unconstitutional, said:

"Election contests for nomination are not matters of equity, and have never been so considered, and the act of the Legislature to vest chancery courts with jurisdiction as to them is unconstitutional and void." *Hester* v. *Bourland,* 80 Ark. 145.

"In the absence of any statute giving them jurisdiction, the courts have no power to interfere with the judgments of the committees and tribunals of established political parties in matters involving party government and discipline," or the nomination of candidates. 15 Cyc. 330.

In *Phelps* v. *Piper,* 67 N. W. 755, the Supreme Court of Nebraska said:

"Political parties are voluntary associations for political purposes. They establish their own rules. They are governed by their own usages. Voters may form them, reorganize them, and dissolve them at their will. The voters ultimately must determine every such question. The voters constituting a party are, in deed, the only body who can finally determine between contending factions or contending organizations. The question is one essentially political, and not judicial, in its character. It would be alike dangerous to the freedom of elections, the liberty of voters, and to the dignity and respect, which should be entertained for judicial tribunals, for the court to undertake, in any case, to investigate either the government, usages or doctrine of political parties, and to exclude from the official ballot the names of candidates placed in nomination by an organization which a portion, or, perhaps, a large majority, of the voters professing allegiance to the particular party believed to be the representatives of its political doctrines and its party government. We doubt even whether the Legislature has the power to confer upon the court any such authority. It is certain, however, that the Legislature has not undertaken to confer it. We shall not enlarge upon the views we have expressed. If authority were needed in their support, we think the underlying principles suggested are those which governed the court in *People* v. *District Court,* 18 Col. 26; 31 Pac. 339; *Shields* v. *Jacob,* 88 Mich. 164, 50 N. W. 105, as well as in *State* v. *Allen, supra.*" See also *Stephenson* v. *Board of Election Commissioners,* 76 N. W. (Mich.) 914; *Potter* v. *Deuel,* 112 N. W. 1071.

It is contended, however, that appellee is given the right to contest the primary election held under the provisions of Act 371 of the Acts of 1911.

It is true that act does not provide for a contest of the primary elections, but it provides tribunals for the hearing of such contests; in the first instance, the Democratic Central Committee, with the right of an appeal therefrom to the State convention, and provides that the

action of such tribunals shall be final. It is true that section 6 contains this provision:

"Provided, nothing in this act shall be so construed as to prevent a person from pursuing any remedy he may have in any of the courts of this State."

This provision does not attempt to confer any right upon such contestant that he did not already have under the laws of this State before the passage of the act, and unless he had such right before its passage, none is given by it.

It has been expressly held that the Legislature is absolutely without power under the provisions of our Constitution to give to the chancery court authority to hear election contests, and certainly the authority to hear such contests and adjudicate the rights of the parties can not be implied from this act that expressly provides tribunals of the party for the determination thereof, and declares that their determination shall be final.

It is suggested, however, that since the Legislature has legalized primary elections for the nomination of candidates to office and provided a tribunal for contesting such nominations that a court of equity will protect them in the rights given by the statute, and that since an equitable remedy is asked that the court may grant it, if it shall not extend to trying the contest, and declaring the nominee.

As already said, no equitable title or right is involved that can give jurisdiction to a court of equity, and inasmuch as a political organization is an unincorporated, voluntary association, in which no rights of property or liberty are involved, a court of equity has no jurisdiction to interfere by injunction to control its actions or those of its officers.

"No principle of the law of injunction is better settled than that injunction does not lie to determine questions of appointment to public office and the title thereto as they are purely legal matters and cognizable only in courts of law." *Alderson* v. *Commissioners* (W. Va.), 5 L. R. A. 334.

"A court of equity will not interfere by injunction to prevent election officers or canvassing officers from doing their duty as required by law, nor prevent them from canvassing votes in a certain way." 6 A. & E. Enc. of Law, 392.

In *Rhodes* v. *Driver*, 69 Ark. 606, this court quoted, with approval from High on Injunctions, section 1312, as follows:

"No principle of the law of injunction, and perhaps no doctrine of equity jurisprudence is more definitely fixed or more thoroughly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment or election of public officers or their title to office, such questions being of a purely legal nature, and cognizable only by courts of law. A court of equity will not permit itself to be made the forum of determining the disputed questions of title to public offices, or for the trial of contested elections, but will, in all such cases, leave the claimant of the office to pursue the statutory remedy, if there be such, or the common law remedy by proceedings in the nature of a *quo warranto*." See also *Adcock* v. *Houck* (Tenn.), 122 S. W. 979; *Williford* v. *State*, 43 Ark. 63; *Lucas* v. *Futrell*, 84 Ark. 550.

The Democratic party, as well as the Legislature of the State, has provided a tribunal for hearing the contests of the primary elections, and it having done so, the decision of such tribunal is final and can not be reviewed by the courts.

In *Shibley* v. *Fort Smith & Van Buren Bridge District*, 96 Ark. 424, the court held that the Legislature had made the power of the board dependent upon the ascertainment of the commissioners that the petition was signed by a majority in value of the property owners, and said:

"Moreover, it is a well settled principle of law that where the Legislature has erected a tribunal for the purpose of ascertaining and declaring the result of an election upon any subject, the decision of such tribunal is

conclusive and can not be reviewed by the courts." Citing, *Govan* v. *Jackson,* 32 Ark. 553; *Rice* v. *Palmer,* 78 Ark. 432.

But it is argued that fraud vitiates everything and constitutes a ground for equitable injunction, and that since the petition alleges that the committee arbitrarily and fraudulently refused to hear the contest, and fraudulently certified appellee's opponent as the nominee of the party, that the chancery court was within the doctrine announced in *Collier* v. *Board of Directors of Jefferson County Bridge District,* 106 Ark. 151, there being no tribunal provided for appellee's relief, that the court of chancery must take jurisdiction to protect his rights. The court said, there:

"If the finding must be treated as conclusive, that is the end of it, so far as the machinery of the law is concerned. For the court can not supply a provision for review where the lawmakers have said there shall be none. But it does not follow that the land owners have no remedy against fraud practiced by the board in making a false declaration of the will of a majority of the land owners of the district. Fraud vitiates any proceeding or transaction, from the judgment of the highest court of the land down to the smallest transaction between individuals, and there is a remedy to purge the fraud. The court of equity is the proper forum for such relief unless the same is otherwise provided by statute. The act creating the district makes conclusive the finding of the board of directors as to a majority petitioning for the improvement; but no intention is attributable to the lawmakers to give a conclusive effect, beyond the remedial power of the court of equity, to a false finding fraudulently announced by the board." *   *   *

"Fraud, which will vitiate the proceedings of the board does not mean errors of the board, either of law or fact. In order to constitute fraud, there must have been an intent not to exercise an honest judgment and make a true finding, but to disregard the facts and make a false finding. This is not alleged in the petition. Taking the

allegations as a whole, they amount only to a charge of error on the part of the board in refusing to hear and consider protests and evidence affecting the question at issue, and that the petition was not, in fact, signed by a majority of the property owners."

The law does provide an appeal from the committee's decision to the convention of the party, which, under the circumstances, the near approach of the election, and the requirements of the law that the nomination should be certified a certain time before its occurrence, prevented the calling of a convention, but, in the above case, unlike this, civil and property rights are involved, and the jurisdiction of equity will extend to their protection under such circumstances, but can not be extended to the protection of mere political rights as alleged herein.

The Democratic Central Committee had the power, under the rules and regulations of the party, and the statute, and it was its duty to hear and determine the contest, declare the result of the election, and determine the name of the candidate receiving the largest number of votes at the primary election according to the returns thereof and certify his name to the Secretary of State, to be by him certified as the candidate of the Democratic party to the various county election commissioners according to law.

This it claims to have done, and the court of equity was without jurisdiction to issue an injunction to compel it to hear the contest in the first instance, and had no power or jurisdiction to review its finding and declare the result of the election in accordance with the chancellor's views of the right thereto, and set aside the finding and judgment of the Democratic party by enjoining the Secretary of State from certifying the name of the nominee furnished him by the said committee to be certified to the election commissioners of the counties. Having assumed to exercise such authority without right, its judgment and decree is void and of no effect, and the decree is reversed, the injunction dissolved and the complaint dismissed.

McCULLOCH, C. J., does not agree to the opinion of the majority. He holds that a chancery court has jurisdiction in such cases on proper allegations of fraud. But he concurs in the judgment on other grounds, which will be stated in a separate opinion.

SMITH, J., concurs in the judgment, but does not agree to all of the opinion.

McCULLOCH, C. J. I can not agree with the views of the majority in holding that a court of equity is without jurisdiction to grant relief upon allegations of fraud on the part of the State committee in declaring the result of a contest. My opinion is that the court does have jurisdiction in such cases, and that this does not violate any of the principles laid down by the various courts in the cases cited in the opinion of the majority.

It must be conceded that courts of equity have no jurisdiction in election contests and that it would be beyond the power of the Legislature to confer any such jurisdiction. *Hester* v. *Bourland,* 80 Ark. 145. But it does not follow that a chancery court can not acquire jurisdiction upon other well established grounds of equitable interference, notwithstanding the fact that it may involve an election contest or a contest for a nomination in a primary election.

Regulation by law of nominations for office is comparatively of recent origin, and cases which hold that no court will interfere in the matter of nominations because those things depend purely upon party regulations, all antedate the enactment of statutes providing for such regulation. In many, if not all, of the States that field has been entered upon as a fit subject of regulation by law, and the courts hold that legal rights are thereunder established which the courts will protect. The cases cited on the brief establish that principle.

In the case of *State* v. *Metcalf,* 100 N. W. 923-925, the Supreme Court of South Dakota said:

"Whenever the Legislature, in its wisdom sees fit to regulate nominations and the printing of ballots by statutory enactments, the duty of interpreting such en-

actments devolves upon the courts, and they should not attempt to escape responsibility or avoid disagreeable consequences by assuming that no judicial questions are involved. The auditor's duties and the candidate's rights respecting the preparation of ballots having been defined by statute in this State, the performance of such duties and the protection of such rights no longer present merely political questions, but must be dealt with as are other legal duties and other legal rights.''

In *Walling* v. *Lansdon,* 97 Pac. 396, the Supreme Court of Idaho said this:

''Every right conferred upon the voter at a primary election held under this law is a legal right, which may be protected, defended, and enforced by appropriate legal methods in the courts of this State. In determining factional disputes in a political organization, and the legality of party primaries and conventions, the courts will go as far as the law goes, and protect all legal rights conferred by law upon all persons participating therein.''

In the case of *Neal* v. *Young,* 75 S. W. 1082, the Kentucky Court of Appeals said:

''Since the adoption of the official ballot system by constitutional convention, since the legislative branch of the State Government provided for the regulation of primary elections by law, questions involving the legal rights of individuals will arise for the determination of the courts. The necessity for such adjudications has been placed upon the courts by the changes which have been made by the organic and statutory law of the State. However much the courts desired to do so, they could not avoid the responsibility of deciding such questions, even if, perchance, some one should fail to discriminate between political rights and those legal rights which arise under the law, and declare the court was adjudicating purely political questions.''

In *Brown* v. *Cole,* 104 N. Y. Supp. 109, it was said:

''There no longer remains any distinction, so far as enforcement is concerned, between civil and political rights of citizens; but it will be presumed that every

right recognized or conferred by statute may be enforced by a proper legal method, and that every wrong, whether civil or political, has its remedy."

Many other cases clearly announce the principle that rights of nominees and of contestants for nominations under primary election laws are such rights as the courts will take cognizance of and enforce. They are no longer treated as purely party questions which the courts refuse to take notice of.

Now, since it is seen that legal rights enforceable in the courts are involved in nominations for political offices, there is no reason why jurisdiction of courts of equity should be excluded, where there exists other independent grounds for equitable interference. The lawmakers have provided in the statute, in effect, that the acts of the committee and the State convention, on appeal, shall be final. But, if the conclusion of the committee is based upon fraud, a distinct ground for equitable interference is afforded.

In the recent case of *Collier* v. *Board of Directors of Jefferson County Bridge District,* 106 Ark. 151, after determining that a statute creating a bridge district and giving the commissioners power to decide whether or not a majority in value had signed a petition for the improvement, we said:

"But it does not follow that the land owners have no remedy against fraud practiced by the board in making a false declaration of the will of the majority of the land owners of the district. Fraud vitiates any proceeding or transaction, from the judgment of the highest court of the land down to the smallest transaction between individuals, and there is a remedy to purge the fraud. The court of equity is the proper forum for such relief unless the same is otherwise provided by statute. The act creating the district makes conclusive the finding of the board of directors as to a majority petitioning for the improvement; but no intention is attributable to the lawmakers to give a conclusive effect, beyond the reme-

dial power of the court of equity, to a false finding fraudulently announced by the board.''

Why does it now follow from this decision that a court of equity has power to cancel and set aside the finding of a committee where fraud is alleged and proved in reaching the result? The same principle is involved, for here we have a case where the contestants have rights which are distinctly recognized under the statutes of the State, and even though power is given to the party machinery to determine the result, yet, upon independent grounds of equity jurisdiction a court of equity has power to set aside the fraudulent action of the committee. It is but the statement of an elemental rule to say that fraud is, and has always been, an independent ground of equity jurisdiction.

''Jurisdiction in matters of fraud,'' says Judge Story, ''is probably coeval with the existence of the court of chancery, and it is equally probable that in the early history of that court, it was principally exercised in matters of fraud not remediable at law.'' 1 Story's Equity, § 185. See also, 1 Pomeroy Equity Jurisprudence (3 ed.), § 119.

Another distinct ground of equity jurisdiction is the inadequacy of all legal remedies. This is nowhere more clearly and forcibly stated than by Judge Walker in the case of *Driver* v. *Jenkins,* 30 Ark. 120, where he said:

''Here there is a right without an adequate remedy at law. It is a maxim in equity that equity will not suffer a right to be without a remedy. This maxim is the foundation of equitable jurisdiction; because that jurisdiction had its rise under the inability of common law courts to meet the requirements of justice.''

In *Conway,* Ex parte, 4 Ark. 302, Mr. Justice Lacy, speaking for the court, said:

''It is no objection to the jurisdiction of a court of equity that a party has a remedy at law, unless it be shown that the legal remedy is plain, direct and complete. The remedy at law, to be adequate and complete, and attain the full end and justice of the case, must reach the

whole mischief and secure the whole right of the party
in a perfect manner *in praesenti* and *in futuro.*"

We have, therefore, two grounds of equity jurisdic-
tion independent of the origin or nature of the original
controversy; that is, the allegation of fraud in the rendi-
tion of the judgment of the committee, and the inade-
quacy of any relief at law for the wrong done. It is a
mistake to say that a court of equity is denied the power
to exercise this original independent jurisdiction merely
because the controversy originated in a contest for a
nomination for office, which is a right clearly established
and recognized under the laws of this State. The judg-
ment of the committee rises no higher than the judgment
of any other court of competent jurisdiction, and it is
well established that a court of equity has jurisdiction
to set aside the judgment of any court for fraud where
there is no legal remedy. It is putting the cart before
the horse, to use a homely phrase, to deny the jurisdic-
tion of a chancery court upon those distinct and inde-
pendent grounds, namely, the allegation of fraud in the
procurement of the jugment, and the inadequacy of the
remedy at law, merely because an election contest or a
contest over a nomination for office does not of itself
afford ground for equitable interference. In other words,
it is not the fact that it is an election contest, but it is
the fact that a legal right is involved and fraud is alleged
and there is no remedy at law which gives a court of
equity jurisdiction.

I think the decision of this court in the case of
*Rhodes* v. *Driver,* 69 Ark. 606, clearly recognizes that
principle. The court stated with emphasis the doctrine
that, "Courts of equity will not interfere by injunction
to determine questions concerning the appointment or
election of public officers or their title to office, such ques-
tions being of a purely legal nature," but held that,
where one was enjoying the possession of office, a court
of equity would, by injunction, prevent interference with
his possession of the office. In that case, it was not the
contest over the office which gave the court of equity

jurisdiction, but the fact that his quiet possession of the office was being invaded, which was found to be an independent ground for the exercise of jurisdiction, and its full play was not restricted because the contest was one for the possession of office. Judge BATTLE, in delivering the opinion, quoted the following from Mr. High's ·work on Injunctions:

"Upon the other hand, the actual incumbents of an office may be protected, pending a contest as to their title, from interference with their possession, and with the exercise of their functions. * * * And the granting of an injunction in such case in no manner determines the question of title involved, but merely goes to the protection of the present incumbents against the interference of claimants out of possession, and whose title is not yet etablished."

So, in the present case, a court of equity has no jurisdiction to enter upon an original investigation over the title to the nomination for Governor, but after the remedy at law has been exhausted and the alleged fraudulent decision has been rendered by the State committee, then the allegation of fraud and the inadequacy of any remedy at law gives the chancery court, in my opinion, complete jurisdiction to grant relief.

These views, I think, find substantial support in the authorities cited on the brief.

In *Miller* v. *Clark,* 62 Pac. 664, the Supreme Court of Kansas held that the finding of a political body on the question of nominations for State offices was conclusive, and would not be disturbed by the courts in the absence of bad faith or arbitrary conduct showing wrongful acts amounting to fraud on the part of said officers, and said:

"We do not hold, however, that if the action of the officers specially designated to pass on the merits of such a controversy was induced by bad faith, or was the result of arbitrary acts showing wrongful conduct amounting to fraud, or their findings result in personal benefit to themselves, that equity would not interpose to prevent a candidate from being thus wronged."

In the case of *Allen* v. *Burrows,* 77 Pac. 555, the same court said:

"It has often been said of special tribunals established by statute to pass upon matters expressly committed to them, that their jurisdiction is exclusive and their determination is final and that courts will not review their conclusions nor inquire by what method they were reached; but always with an express or implied reservation that the statements hold good only where the action of such tribunal is characterized by good faith, and is free from fraud, corruption and oppression."

This is directly in line with what we held in the case of *Collier* v. *Board of Directors of Jefferson County Bridge District, supra,* which, I think, is the controlling principle in this case.

In 19 American & English Encyclopedia of Law, p. 739, the following rule is laid down:

"Courts of equity have jurisdiction to prevent, by injunction, the consummation of a wilful fraud attempted to be perpetrated under the guise of exercise of discretionary powers confided by law to public officers."

I can not conceive any valid reason why the jurisdiction of a court of equity should not be invoked on one of the well established grounds for such interference, such as fraud, accident, or mistake, or the inadequacy of legal remedies, merely because the right to an office is involved or the nomination as a candidate for an office. Let us suppose that, after a primary election is over, and before the result is officially announced, the commissioners of election attempt to destroy the ballots and poll books before the result in the county can be ascertained, can it be doubted that a court of equity would have power to restrain the commissioners from doing the unlawful act, and thus prevent the obliteration of the evidences of the result of the election. Or, suppose, pending a contest in the courts over an election to office, the officers in charge of the ballots should attempt to destroy them, would a court of equity be powerless to prevent the commission of such an unlawful act which

would thus materially and irreparably affect the legal rights of the contestants? I think not.

It seems to me that the majority, in reaching their conclusion, have taken away from a contestant for a nomination the remedy for enforcement of legal rights which are conferred by the statutes of the State, for the legal remedy may be, and often is, inadequate, and if a court of equity has no power to give relief, the possessor of a legal right would, in many cases, be remediless.

If the court of equity has the power, as I think it does, to review the action of the committee on allegation of fraudulent conduct in the hearing, the court could go further and give complete relief by hearing the whole controversy, and declaring such result as the committee should have declared upon a fair hearing. This upon the principle that a court of equity, having rightfully assumed jurisdiction of the subject-matter and of the parties for certain purposes, will, incidentally, grant complete relief without remitting the parties to any other forum. *Dugan* v. *Cureton*, 1 Ark. 31; *Price* v. *State Bank*, 14 Ark. 50; *Vaughan* v. *Bowie*, 30 Ark. 278; *Estes* v. *Martin*, 34 Ark. 410; *Little Rock & Fort Smith Ry. Co.* v. *Perry*, 37 Ark. 164; *Bonner* v. *Little*, 38 Ark. 397; *McGaughey* v. *Brown*, 46 Ark. 25; *Norman* v. *Pugh*, 75 Ark. 52; *Dickinson* v. *Arkansas City Improvement Co.*, 77 Ark. 570.

But the allegations of the complaint in this case, while containing appropriate statements of fraud on the part of the committee, fail in other respects to show grounds for interposition of a court of equity. In other words, Mr. Brundidge fails to state facts which show that he now has a legal right which should be protected, and for this reason, I concur in the result reached by a majority, though not for the reasons which they have given. When this action was commenced, it was obviously too late for Mr. Brundidge to secure a hearing and have his nomination certified during the time provided by the statute. His opportunity to become the nominee for Governor had passed away, and he does not

claim in his pleadings the right to be certified as the nominee of the party. He seeks merely to prevent the certification of his opponent. In my opinion, when this point was reached, his right to question the validity of the nomination had ceased, and that he is not now in possession of any rights which a court of equity should protect.

It is suggested that he could be a candidate without having his name certified as a nominee, that the nomination by the Democratic party is a substantial thing, and that he should have the right to prevent his opponent from having that advantage in the election which is to follow. It is true that the statute provides that blank spaces shall be left on the ticket so that the voters may write the name of any person on the ticket. This does not, however, give any legal right to a candidate for office. It is a mere provision of the law for the benefit of voters, and the only legal rights conferred by the statutes of this State upon a candidate is one who is a nominee either by a political party or by petition of electors. Now that Mr. Brundidge has lost the nomination on account of the acts of the committee and the lapse of time for hearing his contest, his rights are only those which are held in common by other voters of the State, and it can not be contended that those common rights are such as a court of equity should protect. For these reasons, I concur in the judgment of the court reversing the case.